(Surrogate's Court, New York County.  February, 1902.)

1. WILLS—MENTAL CAPACITY.

   Testatrix had been confined in insane asylums several times between 1888 and 1890, and from 1898 to her death, in 1900, and had led a dissipated life from 1890 to 1898.  There was evidence that there were considerable intervals when she was competent to manage her own business.  *Held*, that a will executed by her in 1897, at a time when there was evidence that she was competent to execute it, would be admitted to probate.

2. SAME—RELATIONS WITH BENEFICIARY.

   Where testatrix had, upon her own application, been judicially separated from her husband in 1892, and her will gave her reasons for excluding her relatives from any benefit thereunder, the probate will not be refused because the principal beneficiary was her paramour.

In the matter of the probate of the will of Eliza J. Evans.  Probate decreed.

Blatchford & Sherman, for proponent.
Christian G. Moritz, for contestants.

FITZGERALD, S.  Decedent died March 18, 1900, at the age of 47, leaving a considerable estate, chiefly realty, derived from her father.  By the paper presented for proabte, after providing for the payment of certain charitable bequests and a legacy to her lawyer, she bestowed the entire residue of her estate upon George W. Thurston. Her husband, from whom decedent had been judicially separated in 1892 upon her application, and certain first cousins, contest the probate of the paper in question upon the usual grounds.  The testimony shows that the decedent had been estranged from her relatives for many years, and that her testamentary intentions, which were from time to time varied as the objects of her regard succeeded one another,

disclosed one dominant design,—that her relatives should receive no part of her property. This intention on her part was consistently maintained, and, from her standpoint, it was not without justification. As to the provisions of the will, considered in themselves, I am unable to perceive that they are of such a character as to indicate a lack of comprehension on the part of the deceased of their scope or meaning or effect. The chief object of her bounty may have been her paramour, but he seems to have been the only one to whom she clung during the latter years of her life. When she had been forsaken by her relatives, he cared for her, and did what he could to administer to her comfort and alleviate her condition. When exhausted, dejected, or ill from her repeated dissipations and debauches, he nursed her, and attended to her wants, and her gratitude for his attention and services might very well have found expression in a testamentary disposition in his favor. In 1888 the earliest period respecting which any information is disclosed concerning the history of the decedent, she is found living with her husband in this city. In August of that year she was committed to the institution for the insane on Blackwell's Island by Judge Ehrlich, upon the certificate of two well-known physicians. In September she was discharged improved and intrusted to the custody of her cousin Mary A. Burt, who signed the customary statement that the discharge was contrary to the advice of the physicians, and that she assumed the responsibility of the discharge. In the following November she was committed to the Hudson River Hospital, at Poughkeepsie, by the county judge of Westchester county, from which she was discharged improved in January, 1889. In the fall of the same year she was again committed to the asylum at Middletown by Judge McAdam, whence she was discharged recovered in July, 1890. From this time until February, 1898, she does not appear to have been confined in any institution. After her departure from Middletown she lived with Mrs. Fox until the early part of February, 1891. Her father died in 1892, and she became possessed of his entire estate, and acted as executrix of his will. In this year she brought suit in the supreme court against her husband, and obtained a decree of separation. She appeared in this trial and testified. During the year 1893 we learn of her interviews with her attorney, Mr. Hitchings, whose client she remained for 15 months. In July of that year he drew her will from memoranda furnished by her. This instrument recited her reasons for omitting her relatives in her testamentary dispositions. In October of this year she moved to the house in 113th street. It was while here that her intercourse with Jordan commenced. While here we observe her unconventional manner of forming new acquaintances, in her introduction of the old gentleman to her apartments. While she had this house, some time in the spring of 1895, Thurston first appears upon the scene. She met him upon the train coming from Boston. He was a porter on one of the parlor cars. She was ill, and he treated her kindly. She gave him her card containing her address, and invited him to call upon her. He gave her his address. She afterwards sent the janitress to the depot to find Thurston, and, being unsuccessful, sent again. A few days later she renewed her efforts to find him, succeeded, and from that time he was a frequent

visitor at her apartments. In 1896 she went to live with Mrs. Hassard, who occupied a boarding house at No. 148 West 43d street. From there she went to a flat, No. 447 West 43d street, which she occupied till her removal to Bellevue in February, 1898. In December, 1896, she executed a deed of trust to Thurston of all her property. During the summer of 1897 she took a trip of about six weeks to Buffalo and Niagara Falls in company with Thurston. Shortly after her return she sent the janitor to Boston after Thurston to get him to return, which he did. On October 23d of this year the instrument offered for probate was executed. In February, 1898, she was committed to Bellevue Hospital, and afterwards to the Rivercrest Sanitarium by Judge Bischoff, where she died in 1900. A detailed statement of the incidents related by the witnesses to illustrate her mode of life and her habits at these different periods would serve no useful purpose. Suffice it to say that they present a spectacle which is anything but edifying or agreeable. And yet, despite all the excesses, the dissipation, and the irregularities of life and conduct which marked her career from the time of her removal from Middletown Asylum until her commitment in February, 1898, to Bellevue Hospital, there were during that period frequent and not inconsiderable intervals when she was entirely capable of intelligently transacting business, managing her own affairs, or executing a will. The cases have gone to an extreme point in sustaining testamentary dispositions of property made by chronic victims of the excessive use of alcohol, where it is shown that at the time of the execution of the will the testator was not so overcome by drunkenness as to be unable to comprehend the nature and effect of the instrument and its provisions, or to exercise his volition with adequate freedom and strength. The formal proof as to the mental condition of the decedent at the time of the execution of the paper in question, together with the other proof upon the same subject deduced from the evidence as to her mental state both before and after that event, afford sufficient ground for concluding that at such time the mental faculties of the decedent were not so impaired as to render her incompetent to make a will. As to the claim that the decedent was under restraint and was unduly influenced to execute the paper in question, there is no sufficient evidence to support it. It must therefore be admitted to probate as the will of the decedent.

Probate decreed.